IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NORMAN EBERT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 07 CV 1355 |
| v. | ) | |
| | ) | Judge Joan H. Lefkow |
| VILLAGE OF KILDEER; and | ) | |
| Kildeer Police Officer ANDREW | ) | |
| WEBER, Star 497, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Norman Ebert, filed an eleven-count complaint against defendants, Village of Kildeer and Officer Andrew Weber, asserting claims under 42 U.S.C. § 1983 for unreasonable seizure (Count I), unreasonable search and seizure (Count II), false arrest (Count III), excessive force (Count IV), and illegal searches of person (Counts V and VI), as well as two *Monell* claims against the Village of Kildeer (Counts VII and VIII) and state law claims for malicious prosecution (Count IX), respondeat superior (Count X), and indemnification pursuant to 745 Ill. Comp. Stat. 10/9-102 (Count XI). The court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331 and 1343 for the federal civil rights claims and 28 U.S.C. § 1367(a) for the supplemental state law claims.

Before the court is defendants' amended motion for summary judgment. For the following reasons, the motion [#67] will be granted in part and denied in part.

**LEGAL STANDARDS**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in the depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) & advisory committee's notes.

The party seeking summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

**BACKGROUND**

At around 4:00 P.M. on October 25, 2006, Andrew Weber, an officer of the Village of Kildeer Police Department, was radioed by dispatch about a reckless driver headed south on Rand Road (which is also known as Route 12). Dispatch had received a 911 emergency call from an anonymous woman who complained that a large white truck with no license plate and the words "Kolstad Parts and Service Truck Equipment" on the mud flaps had driven into oncoming traffic to make an illegal left turn onto Rand Road. Shortly thereafter, Weber (who was in the area when he was radioed by dispatch) located the car of the complainant (who was

still on the phone with dispatch) and drove alongside her car. According to Weber, the caller gestured towards a white truck in front of her. Weber noticed that the truck did not have a rear plate and pulled the vehicle over.

The truck was driven by Ebert, a 44-year-old truck driver. Weber has testified that when he approached the truck, he noticed that Ebert had sunglasses perched above his eyebrows and that his eyes were "pinpoint." Ebert, on the other hand, has testified that his sunglasses were covering his eyes at that time.

Weber then informed Ebert that his truck did not have a rear license plate and asked him to exit the truck so that they could speak at the back of the truck. At about the same time, Greg Abshire, another officer of the Village of Kildeer Police Department, arrived as backup.

Officer Weber has testified that once out of the truck, Ebert's sunglasses were covering his eyes, and Weber asked Ebert to remove them, whereupon Weber again noticed that his pupils were constricted. Weber does not dispute that his pupils were constricted, but argues that there was bright sunlight at the time and cites Officer Abshire's testimony that sunlight will constrict pupils (which, Ebert further contends, is an "indisputable fact"). Pl.'s Resp. to Defs.' SoF ¶ 15.

Weber asked Ebert if he had taken illegal drugs, and Ebert said that he had not. Ebert did disclose to Weber, however, that he was on three separate prescription medications—Glucotrol for Type 2 diabetes, Altace for high blood pressure, and Vitorin for cholesterol.

Officer Weber, who has not received training in the area of drug recognition, then administered a number of tests used to determine whether someone has been driving under the

influence of alcohol or drugs. First, the officer[1] performed a Horizontal Gaze Nystagmus ("HGN") test, which Ebert passed.

Second, Weber administered a "walk-and-turn" (a.k.a., "heel-to-toe") test. During the test, Ebert never fell or lost his step, though he admits he did have to regain his balance once by moving his arms back and forth. Also, according to Weber, Ebert stepped off of the line once.

Third, Weber performed the "one-leg-stand" test, in which the subject must stand on one leg for 30 seconds. According to Weber's deposition testimony, Ebert passed the test and did not show any "clues" indicating intoxication.[2] Defs.' SoF, Ex. A (Weber's Dep.), at 58:13–14.

Fourth, Weber administered the Romberg Test, during which Ebert was asked to close his eyes, lean his head back, and estimate what he feels like thirty seconds is. According to Weber, what Ebert believed to be 30 seconds was in fact 37 seconds, which indicated possible drug impairment. Ebert, however, has testified that he believes he passed the test.

Fifth, Weber asked Ebert to stand in the shade for a few minutes, so that his eyes would be out of the sun, and then measured Ebert's pupils using a pupil card. According to Weber, Ebert's pupils were less than 3 millimeters, whereas the normal level of pupil constriction is 3 to

---

[1] While defendants maintain that it was Weber who administered the HGN test, Ebert contends that video evidence shows that it was Abshire, not Weber, who administered the HGN test.

[2] Later in his deposition, Weber testified that he noticed "[Ebert's] legs were noticeably shaking" during the one-leg-stand test and took that as an indication that Ebert was under the influence of a narcotic. Defs.' SoF, Ex. A (Weber's Dep.), at 62:20–63:5. That testimony is inconsistent, however, with Weber's earlier deposition testimony that Ebert did not show any "clues" indicating intoxication during the one-leg-stand test. Defs.' SoF, Ex. A (Weber's Dep.), at 58:13–14.

6 millimeters. Here again, Weber argues that sunlight will constrict pupils and that he had been in bright sunlight less than 4 minutes before his pupils were measured.

Sixth, Weber shined a flashlight into Ebert's eyes to determine whether his pupils would react to light stimulus. Weber has testified that he noticed Ebert's eyes were fixed and non-reactive to light, which Weber believed was an indication of the use of narcotics, though he was not sure which specific narcotic. Ebert argues that Weber's testimony regarding this test is a fabrication, citing evidence that Ebert was sober and had no alcohol or illegal drugs in his system that day.

Seventh, Weber instructed Ebert to open his mouth. According to Weber, he observed a white coating on Ebert's tongue, which he believed to be cotton mouth, an indicator of drug use. Ebert disputes that there was a white coating on his tongue and has submitted an affidavit in which he states that his mouth did not seem dry at the time.

Weber then arrested Ebert, placed him in handcuffs, escorted him to Weber's squad car, and transported him to the police station. Weber admits that Ebert complained about the cuffs, which had apparently tightened down on his wrists after he was placed in the back of the squad car. According to Ebert, the handcuffs were extremely uncomfortable and painful. The cuffs were not removed until Weber arrived at the station. While at the booking room, Ebert observed that there were indentation marks on his right wrist, though not on his left. Ebert admits that there were no contusions, bruises, bleeding, or scratches caused by the cuffs, that the marks from the cuffs lasted "a half hour maybe," and that he received no follow-up medical care as a result of the arrest. Pl.'s Resp. to Defs.' SoF ¶¶ 44–45.

Weber and Ebert arrived at the booking room approximately an hour after the dispatch call out. After a 20-minute period of observation, Ebert was administered a breath test for alcohol, which did not detect the presence of any alcohol in Ebert's system. Officer Weber did not suspect that Ebert was under the influence of alcohol but wanted to exclude alcohol as a possible intoxicant under the influence of which Ebert had been driving.

About an hour later, Ebert was taken to a clinic, where samples of his blood and urine were taken. Weber has testified that Ebert consented to these tests voluntarily. Ebert, on the other hand, contends that any consent was not voluntary, citing the fact that he was under arrest at the time and his testimony that he told Weber, "I have no choice," and Weber said nothing in response. Pl.'s Resp. to Def.'s SoF ¶ 53.

Ebert was released from the custody at about 7:00 P.M. that day. Subsequent laboratory analysis of the blood and urine failed to detect the presence of any alcohol or illegal drugs.

When the Village Attorney initially asked Weber whether she should continue with the prosecution or drop the charges, Weber told her that he wanted to look into the three medications Ebert mentioned at the time of the traffic stop. Weber then went to a Walgreens, where he obtained printouts about the three medications from a pharmacy technician. He also asked the technician if one could operate a motor vehicle while on those medications, and the technician said yes. Weber next contacted the lab that had processed the samples of Ebert's blood and urine and requested a list of the types of drugs the lab had tested for, so that he could attach the list to his report. After the lab declined his request, Weber stopped researching and advised the Village Attorney that he would "leave it up to her best judgment" as to how to proceed with the case.

Defs.' SoF, Ex. A (Weber's Dep.), at 133:13–17.  After three court appearances, the Village Attorney was given leave to *nolle prosequi* the criminal charges against Ebert.

Ebert subsequently filed this case, raising claims against Weber under § 1983 for (1) unreasonable seizure, alleging that there was neither reasonable suspicion nor any other lawful basis for the traffic stop; (2) unreasonable search and seizure, alleging that after the initial stop there was no legal justification to continue to detain Ebert and subject him to field sobriety tests; (3) false arrest, alleging there was no probable cause to arrest Ebert for driving under the influence; (4) excessive force, alleging that the handcuffs became extremely tight and Weber failed to loosen them; and (5) illegal search of person, alleging that there was neither probable cause nor any other legal justification to subject Ebert to the breathalyzer, urine, and blood tests; as well as (6) a state law claim against Weber for malicious prosecution, alleging that Weber instituted charges against Ebert for driving under the influence without probable cause; and claims against Village of Kildeer under (7) § 1983, (8) respondeat superior, and (9) indemnification theories.

## DISCUSSION

### I. The Traffic Stop

In Count I, Ebert alleges that Weber lacked reasonable suspicion or any other lawful basis to stop his truck.  As the Seventh Circuit has explained, "'reasonable suspicion' lies in an area between probable cause and a mere hunch" and "is discovered by common sense." *United States* v. *Fiasche*, 520 F.3d 694, 698 (7th Cir. 2008) (citing *Alabama* v. *White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990)).  In determining whether an officer had reasonable suspicion, the court must consider "the totality of the circumstances known to the

officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States* v. *Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006).

In support of its motion for summary judgment, defendants argue that Weber had probable cause (i.e., more than mere reasonable suspicion) to stop Ebert because "Weber *initially* believed that Mr. Ebert had committed the offense of not having a rear license plate."[3] Defs.' Mem. at 8 (emphasis added). As Ebert points out, however, under the Illinois Vehicle Code, the license plate on "a truck-tractor or an apportioned truck" must be displayed on the front of the truck, not the rear. 625 Ill. Comp. Stat. 5/3-413. Defendants do not dispute that Ebert had an "apportioned" license plate and was not required to display it on the rear of his truck.

In reply, defendants argue that, in any event, Weber had reasonable suspicion for the initial stop because (a) "plaintiff's truck *could have been* required to have one or two license plates" and (b) "Weber needed to stop Plaintiff to investigate the matter, as there was no rear plate as he drove behind the truck and nothing in the record shows that Officer Weber ever had occasion to be in front of the truck." Defs.' Reply at 4. An officer may lawfully conduct a brief investigatory traffic stop that requires only a limited intrusion into an individual's privacy if it is based on "specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant that intrusion." *United States* v. *Riley*, 493 F.3d 803, 808 (7th Cir. 2007) (internal quotation marks and citations omitted); *accord Terry* v. *Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Defendants cite no authority, however, for the proposition that a traffic stop may be constitutional based on an officer's observation of some

---

[3] Defendants do not argue that the anonymous caller's complaint about a reckless driver on Rand Road provided a legal basis for the traffic stop.

8

condition (in this case, the lack of a rear license plate on a truck) that, while sometimes unlawful, is perfectly consistent with lawful conduct. *Cf. Florida* v. *Royer*, 460 U.S. 491, 512, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (Brennan, J., concurring in the result) (indicating that where facts are "perfectly consistent with innocent behavior," they "cannot possibly give rise to any inference supporting a reasonable suspicion of criminal activity"). Indeed, defendants' argument paradoxically suggests that officers patrolling the roads and interstates of Illinois *always* have reasonable suspicion, and thus a legal basis, to pull over *any* truck that lacks a rear license plate, so long as they "never had occasion to be in front of the truck"—despite the fact that the truck may be required under Illinois law to display its plate on its front rather than its rear.

Defendants' motion for summary judgment as to the legality of the initial traffic stop must therefore be denied.

## II.     The Field Sobriety Tests

In Count II, Ebert alleges that, after the initial traffic stop, Officer Weber lacked legal justification to continue to detain him and subject him to field sobriety tests. Defendants argue that Weber was legally justified in submitting Ebert to the field sobriety tests because he had noticed that Ebert's pupils were constricted. Ebert, however, has testified that his sunglasses were covering his eyes at the time that Weber claims he first noticed that Ebert's eyes were "pinpoint." Ebert also contends that the fact that his pupils were constricted would not justify the field sobriety tests because there was bright sunlight at the time and it is well known that sunlight will constrict pupils.

The court finds that, at minimum, an issue of fact exists as to whether Ebert's eyes were obscured by his sunglasses at the time that Weber contends he initially noticed Ebert's pupils

9

were constricted.[4] Defendants' motion for summary judgment as to the legality of submitting Ebert to field sobriety tests must therefore be denied.

**III.     The Arrest**

In Count III, Ebert alleges that Weber lacked probable cause to arrest him. An officer has probable cause to arrest if he "possess[es] knowledge from reasonably trustworthy information that is sufficient to warrant a prudent person in believing that [the] suspect has committed, or is committing, a crime." *United States* v. *Hobbs*, 509 F.3d 353, 360 (7th Cir. 2007) (citing *United States* v. *Brown*, 366 F.3d 456, 458 (7th Cir. 2004)).

Defendants argue that Weber had probable cause to arrest Ebert for driving under the influence of drugs based on the results of the field sobriety tests. Specifically, defendants cite evidence that Weber arrested Ebert based on his observations of (1) the size and non-reaction to light of Ebert's pupils; (2) the shaking of Ebert's leg during the one-leg-stand test; (3) Ebert's slow estimation of time during the Romberg test; (4) the two "clues" exhibited during the walk-and-turn test—stepping off the line once and moving his arms back and forth to regain his balance once; and (5) the white coating on Ebert's tongue. Defs.' Reply at 7.

Other than the two "clues" from the walk-and-turn test, however, Ebert has raised factual disputes as to each of the observations on which Weber assertedly based his decision to arrest Ebert. Defendants' motion for summary judgment as to the legality of Ebert's arrest is therefore denied.

---

[4] Although defendants raise additional arguments on this issue in their reply memorandum, the court will not consider those here. *See Citizens Against Ruining the Environment* v. *E.P.A.*, 535 F.3d 670, 675 (7th Cir. 2008) ("It is improper for a party to raise new arguments in a reply because it does not give an adversary adequate opportunity to respond.").

10

## IV. The Excessive Force Claim

In Count IV, Ebert alleges that Weber used excessive force in violation of the Fourth Amendment when the handcuffs became extremely tight on Ebert's wrists and Weber did not loosen them. The force used by officers to effect an arrest must be objectively reasonable under the Fourth Amendment. *Chelios* v. *Heavener*, 520 F.3d 678, 689 (7th Cir. 2008). To determine whether such force was reasonable, the court must engage in a "careful balanc[ing] of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (internal quotation marks and citations omitted).

Defendants argue that the force used by Weber in cuffing Ebert was reasonable because Ebert (1) "merely deemed the cuffing to be 'uncomfortable'"; (2) experienced no physical damage or injury other than a visible indentation that "lasted a half hour maybe"; and (3) received no follow-up medical care. Defs.' Mot. at 11. Defendants rely on *Tibbs* v. *City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006), where the plaintiff had presented evidence that he (1) likely suffered some discomfort and pain from handcuffs that the arresting officer applied "somewhat too tightly"; (2) complained about the tightness without elaborating on any injury; (3) was handcuffed for about 25 to 30 minutes; (4) experienced redness on his wrists for less than two days; and (5) neither sought nor received medical care for any alleged wrist injury. *Id.* The Seventh Circuit held that no reasonable jury could find that the officer's actions were unreasonable in light of "such mild allegations." *Id.*

In response, Ebert cites his testimony that (a) after he was placed in the back of the squad car, the cuffs on his right hand "got extremely tight" and (b) when he asked Weber two or three

times to loosen the cuffs, the officer did not. Pl.'s Resp. at 7; *see also* Defs.' SoF, Ex. C (Ebert's Dep.), at 57:4–12. Ebert has failed to demonstrate, however, that his excessive force allegations are more serious than, or otherwise distinguishable from, those considered by the Seventh Circuit in *Tibbs*. Rather, in comparison to those in *Tibbs*, Ebert's allegations appear to be at most equal, if not lesser, in severity. Defendants' motion for summary judgment as to Ebert's excessive force claim, Count IV, must therefore be granted.

## V. The Breathalyzer, Blood, and Urine Tests

In Counts V and VI, Ebert alleges that Weber lacked probable cause to subject Ebert to the breathalyzer test at the police station or to obtain blood and urine samples from him at the clinic. Defendants concede that the collection and subsequent analysis of blood and urine samples are searches under the Fourth Amendment. Defs.' Mem. at 8 (citing *Skinner* v. *Ry. Labor Executives' Ass'n*, 489 U.S. 602, 617, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989)). The Supreme Court case that defendants cite for that proposition, *Skinner v. Railway Labor Executives' Association*, further states that "[s]ubjecting a person to a breathalyzer test, which generally requires the production of alveolar or 'deep lung' breath for chemical analysis, implicates similar concerns about bodily integrity and, like the blood-alcohol test . . . , should also be deemed a search." 489 U.S. at 617–18.

Defendants argue that Weber nevertheless had probable cause for the three tests based on the same observations that, according to defendants, provided Weber probable cause for Ebert's arrest. Having decided that an issue of fact exists as to whether Weber had probable cause to arrest Ebert, the court likewise finds that an issue of fact exists as to whether Weber had probable cause for the breathalyzer, blood, and urine tests.

12

Defendants further argue that even if probable cause was lacking, Ebert volunteered for and consented to the tests. Ebert has presented evidence, however, that he felt he had "no choice" about taking the tests, as he was under arrest at the time and had not been read his *Miranda* rights. Ebert also testified that when that he told Weber he felt he had "no choice" but to submit to the tests, Weber said nothing in response. An issue of fact thus exists as to whether Ebert consented to the tests voluntarily.

Defendants' motion for summary judgment as to Counts V and VI is therefore denied.

## VI. The Malicious Prosecution Claim

In Count IX, Ebert asserts a malicious prosecution claim against Officer Weber. To prevail on a claim for malicious prosecution under Illinois law, the plaintiff must show "(1) he was subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendants instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury." *Reed* v. *City of Chicago*, 77 F.3d 1049, 1051 (7th Cir.1996).

Defendants argue that Ebert's malicious prosecution must fail because Weber had probable cause to arrest Ebert and institute charges against him. Defendants also argue that "Ebert has not claimed that Officer Weber exerted pressure or influence over the prosecutor" and "Weber gave deference to the Village Attorney's decision to prosecute when he advised the Attorney that [he] would leave it to the Attorney's best judgment as to whether to proceed with the case." Defs.' Mem. at 13. Because issues of fact remain as to whether probable cause existed and Weber's role in the decision to maintain the charges after the arrest, defendants' motion for summary judgment must be denied as to Count IX.

13

## VII. Qualified Immunity

Defendants argue that Weber is entitled to qualified immunity for his alleged conduct. In the context of a § 1983 suit for damages stemming from a warrantless arrest, the arresting officer is entitled to qualified immunity from liability if a reasonable officer could have believed that the plaintiff's arrest was lawful, in light of clearly established law and the information possessed by the arresting officer. *Jones* v. *Watson*, 106 F.3d 774, 778 (7th Cir. 1997). Thus, even if the arresting officer mistakenly concluded that probable cause was present, he may be entitled to qualified immunity if that conclusion was reasonable. *Id.*

In this case, there is, as discussed above, an issue of fact as to whether Officer Weber had probable cause to arrest Ebert. The court likewise finds that an issue of fact exists as to whether a reasonable officer could have believed that probable cause existed, in light of clearly established law and the information possessed by the Weber at the time of the arrest. Defendants' motion for summary judgment on the basis of qualified immunity must therefore be denied.

## VIII. The *Monell* Claims

Defendants argue that summary judgment should be granted as to Ebert's *Monell* claims, Counts VII and VIII, because he has failed to establish any sort of policy or custom that caused the alleged constitutional violations. In his response memorandum, Ebert states that he "now withdraws the *Monell* claims." Pl.'s Resp. at 9. In light of Ebert's representation, defendants' motion for summary judgment is granted as to Counts VII and VIII.

## CONCLUSION

Defendants' amended motion for summary judgment [#67] is granted in part and denied in part. Judgment is hereby entered in favor of the defendants as to Counts IV, VII, and VIII. Defendants' motion is denied as to all other counts.

Dated: March 31, 2009        Enter: _____
JOAN HUMPHREY LEFKOW
United States District Judge